UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| KETZ & ASSOCIATES, INC., a Minnesota corporation, | Case No. 23-CV-3397 (PJS/EMB) |
| Plaintiff, | |
| v. | ORDER |
| CREATIVE KIDS FAR EAST, INC., a New York corporation; and BAP INVESTORS, LLC, a New York limited liability company, | |
| Defendants. | |

---

D. Clay Taylor and Nicholas Clay Taylor, TAYLOR FRICTION, PLLC, for plaintiff.

Solomon Rosengarten, for defendants.

Plaintiff Ketz & Associates, Inc. ("Ketz") is an independent sales agency that markets and sells toys on behalf of manufacturers and importers. Defendant BAP Investors, LLC ("BAP") is a manufacturer and importer of toys.[1] BAP licenses certain trademarks and other intellectual property from defendant Creative Kids Far East, Inc. ("Creative Kids"), with which BAP shares ownership, offices, and employees. In this

---

[1] Although the caption of the amended complaint and the docket of this case identifies this defendant as "BAP LLC," the body of the amended complaint makes clear that the correct name of this defendant is "BAP Investors, LLC." *See* Am. Compl. at 1 ("COMES NOW, the Plaintiff, Ketz & Associates, Inc. ('Ketz'), for its claims against Defendants, BAP Investors, LLC ('BAP') and Creative Kids Far East, Inc."); *id.* ¶ 2 (identifying "Defendant, BAP Investors, LLC").

action, Ketz brings breach-of-contract, quantum meruit, and statutory claims against BAP and Creative Kids, alleging that they have failed to pay approximately $350,000 in sales commissions owed to Ketz.

This matter is before the Court on Ketz's motion for partial summary judgment on its claims for breach of contract (Count III) and recovery of the statutory penalty provided by Minn. Stat. § 181.145 for failure to pay commissions (Count V).[2] For the reasons that follow, Ketz's motion is granted. The Court also awards attorney's fees to Ketz under § 181.145.[3]

## I.  BACKGROUND

As noted, Ketz is an independent sales agency that specializes in marketing and selling toys on behalf of manufacturers and importers. Ketz Decl. ¶ 2. Ketz sells toys to a wide variety of retailers, including Target. Ketz Decl. ¶ 2. Ketz works on a commission basis. Ketz Decl. ¶ 2.

---

[2]Defendants did not file a timely response to Ketz's motion. After granting one extension and partially granting a second, *see* ECF Nos. 84, 86, the Court denied defendants' (untimely) request for reconsideration and a further extension, ECF No. 90. Ketz's motion is therefore unopposed.

[3]In the alternative to judgment on its breach-of-contract claim, Ketz seeks judgment on its claim for failure to pay commissions in violation of Minn. Stat. § 325E.37 (Count II). Because the Court grants Ketz's motion as to its breach-of-contract claim, the Court need not address Ketz's claim under § 325E.37.

BAP licenses trademarks and other intellectual property from Creative Kids, and both entities import Creative Kids-branded goods and distribute such goods in the United States. Ketz Decl. ¶ 5. BAP and Creative Kids do business together under the name BAT, LLC ("BAT"). BAT maintains bank accounts through which BAP and Creative Kids receive funds from retailers and pay commissions to Ketz. Ketz Decl. ¶ 6.

In 2003, BAT's predecessor, Steve Spangler, Inc., d/b/a BE AMAZING! ("BAM!"), commissioned Ketz as an independent sales representative. Ketz Decl. ¶ 7. Ketz's and BAM!'s contract is memorialized in a written Sales Representative Agreement ("Agreement") dated July 30, 2003. Ketz Decl. ¶ 7; Taylor Decl. Ex. 1. Under the Agreement, Ketz earns a ten percent commission on the wholesale prices of products that it sells on BAM!'s behalf. Taylor Decl. Ex. 1 ¶ 7(A). The Agreement is for an indefinite duration and can be terminated by either party upon 30 days' written notice. Ketz Decl. ¶ 7; Taylor Decl. Ex. 1 ¶ 8(A).

Ketz opened a Target account for BAM! in approximately 2005; by 2022, Ketz's annual sales of BAM!-branded products to Target totaled over $5.2 million. Ketz Decl. ¶ 9. Due to the large volume of sales to Target, Ketz agreed to a reduced commission of five percent on Target sales. Ketz Decl. ¶ 9.

In approximately 2018, Creative Kids acquired most of BAM!'s intellectual property. Ketz Decl. ¶ 10. BAT (that is, Creative Kids and BAP acting together)

retained Ketz to continue servicing the Target account. Ketz Decl. ¶ 11. For several years, BAT paid commissions at the rates specified in the Agreement—that is, five percent on Target sales and ten percent on all other sales. Ketz Decl. ¶ 11. Eventually, however, BAT fell into arrears on commission payments. Ketz Decl. ¶ 6(2).[4]

In September 2021, BAT sales manager Collette Trejo asked Ketz to consider reducing its commission rate for certain categories of the Target business. Taylor Decl. Ex. 5. Ketz did not respond to Trejo's request. Taylor Decl. Ex. 5. A few months later, in February 2022, Trejo followed up by asking Brad Ketz, owner of Ketz, if he would agree to restructure the Target commission rate, lowering it for some categories and raising it for others. Ketz Decl. ¶¶ 1, 10(2); Taylor Decl. Ex. 5. Brad Ketz declined, responding that, "before we talk about commission rates, we need to talk about commission payment," and noting that BAT had not paid commissions to Ketz since the previous October. Taylor Decl. Ex. 5. During a phone call the following week, Brad Ketz informed Trejo that Ketz would not agree to revised commission rates while BAT owed Ketz so much money. Ketz Decl. ¶ 13. Following this conversation, BAT continued to make (sporadic) commission payments to Ketz on the Target account at the rate of five percent. Ketz Decl. ¶ 23; Maslennikov Dep. 70–71, 87–89, 93, 99.

---

[4]The paragraphs in the Ketz declaration are numbered 1 through 11, after which they re-start at 6. To distinguish the duplicate numbers, the Court will cite the second set with a (2).

Ketz continued to struggle to get BAT to make commission payments. By the summer of 2023, BAT had not made any payments to Ketz for 2023 sales and still owed money for 2022. Ketz Decl. ¶ 25. On August 21, 2023, Ketz emailed BAT and pointed out that BAT owed Ketz more than $200,000. Ketz Decl. ¶ 25; Taylor Decl. Ex. 12. BAT initially responded by sending a reconciliation for unpaid 2022 and 2023 commissions that was slightly lower than Ketz's estimate, but that used the five-percent commission rate. Ketz Decl. ¶ 26; Taylor Decl. Ex. 13. Less than an hour later, however, BAT followed up, asking Ketz to disregard the previous email because the commission rates had changed. Ketz Decl. ¶ 27; Taylor Decl. Ex. 12. Ketz promptly responded, denying that the rates had changed. Ketz Decl. ¶ 27–29; Taylor Decl. Ex. 12.

About a week later, BAT terminated Ketz as to the Target account. Ketz Decl. ¶ 31; Taylor Decl. Ex. 15. Ketz responded that terminating Ketz from Target was "shocking" given the amount of commissions it was owed and stated that, if BAT did not reinstate Ketz to the Target account and make "real progress" on overdue commissions, Ketz would consider its relationship with BAT to be terminated effective immediately. Ketz Decl. ¶ 31; Taylor Decl. Ex. 15. Ketz added that, if Ketz was terminated, "please let this email serve as Ketz & Associates' immediate demand for the payment of all outstanding commissions and for payment of all commissions that come due on our pipeline of Target and non-Target business." Taylor Decl. Ex. 15. After

about a week with no response, Ketz emailed BAT that "we will assume that Ketz & Associates has been terminated as of my last email." Taylor Decl. Ex. 15. BAT paid no further commissions to Ketz—not even amounts that BAT admitted were due. Ketz Decl. ¶ 32. This lawsuit followed.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Breach of Contract

Ketz first seeks summary judgment in its favor on its breach-of-contract claim for unpaid commissions. "Under Minnesota law, a breach-of-contract claim has four elements: '(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages.'" *Nelson*

*v. Am. Fam. Mut. Ins. Co.*, 899 F.3d 475, 480 (8th Cir. 2018) (quoting *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013)).[5]

Undisputed evidence in the record establishes all four of these elements. To begin, defendants admit that Ketz served as BAP's sales representative. Taylor Decl. Tab E at 9. Moreover, Ketz offers uncontradicted evidence that it provided services to, and was paid by, BAT—the name under which Creative Kids and BAP did business together. This is sufficient to establish an implied-in-fact contract with BAT—that is, with both Creative Kids and BAP.

As to Ketz's performance, Ketz offers three spreadsheets, produced by BAT, that document Ketz's sales to Target and other stores—sales for which Ketz never received compensation. Ketz Decl. ¶¶ 32, 34. Given that BAT itself produced these spreadsheets, there can be no dispute that Ketz fulfilled its duties as sales representative and earned commissions on the sales documented on the spreadsheets. Finally, Ketz

---

[5]The Agreement includes a Colorado choice-of-law provision. Taylor Decl. Ex. 1 § 12. Defendants argue, however, that their relationship with Ketz was not governed by the Agreement and therefore the choice-of-law clause does not apply. Taylor Decl. Tab E at 9. Because applying Colorado law would not change the result, the Court may apply Minnesota law without deciding whether the Agreement applies or engaging in a choice-of-law analysis. *See Phillips v. Marist Soc. of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996); *see also Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024) (to prevail on breach-of-contract claim, a plaintiff must establish "(1) the existence of a contract, (2) the plaintiff's performance of the contract or justification for nonperformance, (3) the defendant's failure to perform the contract, and (4) the plaintiff's damages as a result of the defendant's failure to perform the contract.").

offers uncontradicted evidence that it did not receive nearly $350,000 in commissions owed on those sales. Ketz Decl. ¶ 35.

The only issue that is possibly in dispute in this case is the commission rate on certain sales to Target. But the record is entirely devoid of evidence to support BAT's contention that the commission rates changed in 2022. By contrast, Ketz offers evidence that it rejected the proposed change, Ketz Decl. ¶¶ 13, 29, Taylor Decl. Ex. 12, and that BAT had consistently calculated and paid its commissions at five percent, Ketz Decl. ¶ 23, Maslennikov Dep. 70–71, 87–89, 93, 99. Defendants' Fed. R. Civ. P. 30(b)(6) designee could not identify any evidence that Ketz agreed to change its commission rates. Maslennikov Dep. 100–01, 102–04, 110. Notably, this witness is Creative Kids's controller, yet he did not hear about the purported change to the Target commission rates until August 2023, a year and a half *after* the change had supposedly taken effect and immediately before BAT terminated Ketz from the Target account. Maslennikov Dep. 98–99, 101.

As to the amount of unpaid commissions, the Court notes a slight discrepancy between Ketz's calculation and the Court's. Relying on BAT's spreadsheets (which Ketz offers as Exhibits 17, 18, and 19), Ketz asserts that it is owed $349,003.49 in unpaid commissions. Ketz Decl. ¶ 35. But based on Exhibit 19, the Court calculated a slightly lower figure than appears in the Ketz declaration—$6,055.27 rather than $6,552.74—for

unpaid commissions for small-store sales.  *See* Ketz Decl. ¶ 35.  The Court arrived at the lower figure by applying the ten percent commission rate to $60,552.74, which represents the sales figures documented in Exhibit 19 less the $91,941.36 in sales attributable to Target (and which matches the figure used by Ketz, *see* ECF No. 77 at 18).[6]  The Court therefore grants Ketz's motion for summary judgment on its breach-of-contract claim (Count III of its amended complaint) for $348,506.02 in unpaid commissions.

### C.  Minn. Stat. § 181.145

Ketz also moves for summary judgment on Count V, its claim for a penalty under Minn. Stat. § 181.145.  Subdivision 3 of that statute provides as follows:

> If the employer fails to pay the salesperson commissions earned through the last day of employment on demand within the applicable period as provided under subdivision 2, the employer shall be liable to the salesperson, in addition to earned commissions, for a penalty for each day, not exceeding 15 days, which the employer is late in making full payment or satisfactory settlement to the

---

[6]The Court also notes that there is a discrepancy in Exhibit 17 between the 2022 Target sales figure on the initial summary page and the figure at the bottom of the itemized list of 2022 Target sales elsewhere in the exhibit.  The higher figure, which is based on the itemized list, appears to be more reliable, and also appears to be the number that Ketz actually used in its calculations, notwithstanding the numbers in its brief for total Target sales (in which the math is incorrect in multiple places, *see* ECF No. 77 at 17–18, 23).  The Court agrees that the higher 2022 sales figure from Exhibit 17 is more likely than not correct and has relied on it in its calculations.  The resulting figure of $453,673.90 in commissions on Target sales matches the number claimed in Ketz's papers.  *See* Ketz Decl. ¶ 35; ECF No. 77 at 18.

> salesperson for the commissions earned through the last day
> of employment. The daily penalty shall be in an amount
> equal to 1/15 of the salesperson's commissions earned
> through the last day of employment which are still unpaid at
> the time that the penalty will be assessed.

Ketz, as a Minnesota "commission salesperson" within the meaning of the statute, is clearly entitled to its protections. *See id.* subd. 2 (requiring prompt payment of commissions to any "commission salesperson [employed] in this state" who resigns or is terminated); *McClure v. Davis Eng'g, L.L.C.*, 716 N.W.2d 354, 357 (Minn. Ct. App. 2006) ("person" in § 181.145 is not limited to natural persons).

Ketz is also entitled to recover a penalty. Upon termination, Ketz made a clear demand for payment, following which BAT had three days to make full payment.[7] Minn. Stat. § 181.145, subd. 2. Fifteen days after full payment was due, BAT became liable for the maximum penalty allowed under the statute, which is 100 percent of the commissions that were past due on the date of Ketz's termination. *Id.* subd. 3. Subtracting the $60,082.92 in commissions attributable to 2024 Target sales, *see* Taylor Decl. Ex. 17, ECF No. 77 at 18, yields a penalty of $288,423.10. Ketz's motion for summary judgment on its claim to recover a penalty under § 181.145 is therefore granted as to that amount.

---

[7]The time to make payment is extended to six days if a salesperson resigns without giving five days' written notice. Minn. Stat. § 181.145, subd. 2(c). Even if BAT contended that this longer period applied, the years-long delay in payment means that BAT is liable for the same penalty.

Finally, Ketz seeks an award of attorney's fees and costs under both Minn. Stat. § 181.145 and Minn. Stat. § 325E.37.  Ketz is clearly entitled to recover reasonable attorney's fees pursuant to § 181.145, subd. 4(b), and Ketz may move under Fed. R. Civ. P. 54(d) to recover those fees after this case is fully resolved and judgment is entered.  Section 325E.37 does not give this Court authority to award fees, however, as that provision authorizes only arbitrators to award fees.  *See id.* subd. 5(b); *R.L. Mlazgar Assocs., Inc. v. Focal Point, LLC*, No. 22-CV-0942 (NEB/TNL), 2022 WL 3685388, at *3 n.1 (D. Minn. Aug. 25, 2022) ("Mlazgar argues the MTSRA permits attorney's fees, but 'reasonable attorneys' fees and costs' are awardable only through arbitration." Minn. Stat. § 325E.37, subdiv. 5(b).").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion for partial summary judgment [ECF No. 80] is GRANTED as to Counts III and V of plaintiff's amended complaint.

    a. Plaintiff is entitled to recover $348,506.02 in unpaid commissions from defendants on Count III of the amended complaint. Defendants are jointly and severally liable for this amount.

  b. Plaintiff is entitled to recover $288,423.10 as a penalty from defendants on Count V of the amended complaint. Defendants are jointly and severally liable for this amount.

  c. Plaintiff is entitled to recover "reasonable attorney's fees" from defendants pursuant to Minn. Stat. § 181.145, subd. 4(b). The amount of those fees will be determined upon motion following the entry of final judgment at the close of this case.

2. Plaintiff's motion for partial summary judgment is DENIED AS MOOT as to Count II of its amended complaint and DENIED as to plaintiff's claim for attorney's fees pursuant to Minn. Stat. § 325E.37, subd. 5.

Dated: December 17, 2025      /s/ Patrick J. Schiltz
                  Patrick J. Schiltz, Chief Judge
                  United States District Court